KOPPERS COMPANY, INC.,
Defendant-Appellant,

v.

INLAND STEEL COMPANY,
Plaintiff-Appellee.

No. 3–784A205.

Court of Appeals of Indiana,
Third District.

Oct. 20, 1986.

Thomas D. Allen, Robert E. Kehoe, Jr., Robert L. Shuftan, Thomas E. Patterson, Wildman, Harrold, Allen & Dixon, Chicago, Ill., Leon R. Kaminski, Mark A. Lienhoop, Newby, Lewis, Kaminski & Jones, LaPorte, for defendant-appellant.

Alan H. Lobley, Ice, Miller, Donadio & Ryan, Indianapolis, Wilbur D. Preston, Jr., Nevett Steele, Jr., Ann MacNeille, Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, Md., for amicus curiae, National Constructors Assn.

Stephen C. Neal, Steven J. Harper, David F. Tanaka, John W. Roberts, Kirkland & Ellis, Chicago, Ill., J.B. King, Virgil L. Beeler, Baker & Daniels, Indianapolis, David B. Anderson, James J. Romanek, Inland Steel Co., Chicago, Ill., for plaintiff-appellee.

GARRARD, Judge.

Inland Steel Company (Inland) and Koppers Company, Inc. (Koppers) entered into agreement for the design, engineering and construction of a blast furnace and a battery of sixty-nine coke ovens to be installed at Inland's Indiana Harbor premises.

Because of the magnitude of the project and to facilitate its construction the parties entered into what may be referred to as a design-build arrangement instead of the more traditional approach of completing the design and engineering phases and then utilizing the specifications to secure a firm bid. This arrangement contemplated that a variety of modifications or changes might occur before the project was completed. To accomplish their goal the parties entered into four separate agreements which undisputedly are to be integrated in their interpretation. They consist of the Engineering Contract, the Agency Agreement, the Field Erection Contract and the Bonus Penalty Agreement.

The project was completed and by all accounts constitutes a superior facility. However, the project took nearly two years beyond the estimated time of completion and cost $444 million rather than the estimated $267 million. Inland brought suit for breach of contract asserting that Koppers should be liable for much of the excess cost, and Koppers counterclaimed for the balance of its unpaid fee. The case was tried by jury. It found for Inland on its claim and assessed damages at $73,950,-000 and found for Koppers on its counterclaim with an award of $10,048,000. The court entered judgment on the verdict in favor of Inland for the net sum of $63,902,-000.

Koppers now raises a number of issues on appeal, but its front line position is that its liability for damages was strictly limited by the provisions of the Bonus Penalty Agreement as executed by the parties.

To examine that contention it is necessary to look at the various contracts which comprise the total agreement.

In the Engineering Contract Koppers agreed to furnish all design and detail engineering necessary to produce the facility. The scope of the work could be changed from time to time by written addenda agreed to and signed by the parties. In other salient provisions: (1) Koppers agreed to start work immediately and pur-

sue the work diligently to completion; (2) Koppers warranted the work should be free from all defects or faults of design or engineering and provided that any such errors should be corrected at no change in the contract price, "but Koppers shall have no other liability under the contract for such errors;" and (3) Koppers' liability for consequential damages was excluded.

The contract provided that if Koppers at any time refused, failed or neglected (except for causes beyond its reasonable control or Inland's breach of the contract) to prosecute the work with promptness and diligence or perform any of its other obligations, Inland could give written notice and terminate Koppers' right to proceed if it did not immediately take effective steps to cure the breach. Under such circumstances, if the aggregate cost of completing the contract exceeded the unpaid balance of the contract price, "Koppers shall be liable for and shall promptly pay the difference to Inland."

Finally, the contract provided that any failure to enforce or require the strict keeping of any of its terms or conditions:

" ... shall not constitute a waiver by Inland of such terms or conditions, and shall not affect or impair such terms or conditions in any way or the right of Inland at any time to avail itself of such remedies as it may have for any breach or breaches of such terms or conditions."

Under the Field Erection Contract Koppers was to furnish all small tools, labor and supervision necessary for construction of the entire project except for certain listed exclusions. This agreement contained provisions similar to those in the Engineering Contract on work changes, performing with diligence, warranting the work free of defects or faults, excluding consequential damages, giving Inland the right to cancel and secure damages if the cost of completion exceeded the contract price, and preserving Inland's rights to avail itself of remedies for breaches.

The Agency Agreement followed the same format and appointed Koppers as Inland's agent to purchase materials, rent or purchase equipment and place orders with contractors to provide field services for the project.

The fourth document, entitled Bonus Penalty Agreement, recited that Inland had entered into the three other agreements and wished to provide an incentive for Koppers to perform at the lowest possible cost.

This agreement then divided the costs to Inland under the three other contracts into (1) Construction Costs, and (2) Engineering and Material Costs. "Construction Costs shall mean field labor costs (whether performed by Koppers or others), construction equipment costs (whether purchased or rental) and other field costs." "Engineering and Material Costs shall mean costs for engineering, procurement, purchased materials and all overhead on all three contracts plus Koppers' entire fee on all three contracts."

This agreement then established "target costs" for each area as well as a provision for their adjustment to reflect certain specified actual costs and deviations agreed to during the work's progress. To the extent deviations resulted in an overall increase in cost exceeding eight million dollars, Koppers was to be paid an additional fee of 3%.

The agreement then provided the following concerning overruns and underruns:

"6.  *Overruns*

If both Engineering and Material Costs and Construction Costs overrun their respective Target Costs, Koppers will be obliged to refund to Inland an amount equal to (a) that part of the overrun attributable to Construction Costs which does not exceed $1,500,000 plus 30% of the remaining portion of the overrun, if any; provided that, in no event will the refund be more than $4,800,000; plus (b) the amount of overrun attributable to Engineering and Material Costs.

7.  *Underruns*

If both the Engineering and Material Costs and the Construction Costs underrun their respective Target Costs, Koppers will be entitled to additional compen-

sation over and above its total fee equal to 50% of the total underrun; provided that, in no event will the additional compensation exceed $6,300,000.

"8.  *Bonus or Penalty*

If there is an underrun in either the Engineering and Material Costs or the Construction Costs, and an overrun in the other component, the underrun and overrun will be netted.  If the balance is an underrun, Koppers will be entitled to additional compensation computed in accordance with Section 7 above on such balance.  If the balance is an overrun resulting from excess Construction Costs, Inland will be entitled to a refund computed in accordance with Clause (a) in Section 6 above on such balance.  If the balance is an overrun resulting from excess Engineering and Material Costs, Inland will be entitled to a refund equal to such balance."

The Field Erection Contract is to be interpreted under Indiana law.  The other three contracts provide that they are to be interpreted according to the law of Pennsylvania.

It is of special note that the Bonus Penalty Agreement nowhere speaks in terms of fault, good faith, reasonableness, diligence, negligence, bad faith or fraud.  It is simply silent concerning the causative forces behind either increased or reduced costs compared to the established target costs.  This is indeed Koppers' position: Since the agreement draws no distinction, the *only* reasonable inference is that the parties intended the Bonus Penalty Agreement to govern any overruns regardless of why or how they occurred.

That is the issue.  Should all costs of the project be simply treated as "overrun" regardless of whether the contractor was acting with reasonable diligence in incurring them, or when read together do the agreements of the parties contemplate a distinction between additional costs which were occasioned by culpable acts or omissions on the part of the contractor and costs which occurred otherwise?

In  *Fogel Refrigerator Co. v. Oteri* (1958), 391 Pa. 188, 137 A.2d 225, 230, the Pennsylvania Supreme Court declared:

"[T]he intention to diminish, curtail or deny any of the normal rights which accrue from a given relationship must be manifested with the *greatest particularity*.  The writing relied upon as an expression of the intention must be construed strictly against the party seeking to invoke it." (emphasis in original, citations omitted)

Similarly, while recognizing that the parties to a contract may agree to a limitation on damages, in *Loyal Christian Benefit Association v. Bender* (1985), 342 Pa.Super. 614, 493 A.2d 760, 763 the court said recently:

"We hold that the limitation of the afflicted parties' right to seek full redress is of such serious consequence that, in order to be effective, it must be written in clear, direct, and unmistakable language."

Indiana decisions have reached a similar result in holding that damages arising from construction delays were not barred by a notice requirement which applied to any "increase in the Contract Sum." *Osolo School Buildings v. Thorleif Larsen & Son* (1985), Ind.App., 473 N.E.2d 643, *transfer denied.*

Here, the four documents which comprise the agreement must be construed together.  *Fogel Refrigerator Co., supra.*

At the time the agreements were entered into there were a great number of unknowns..  Engineering was largely in prospect.  Exact prices for labor and materials were not ascertainable and it was expressly contemplated that the parties might desire to effect major, as well as minor, changes during the course of the work.  Accordingly, it would have been meaningful to enter into some arrangement like the Bonus Penalty Agreement premised entirely upon the notion that all the contracts would be performed without breach.

On the other hand, the other three contracts do contemplate that duties are created and a breach may occur.  While the

Engineering Contract specified that the remedy for design and engineering defects was that Koppers would correct them without additional charge, the Pennsylvania courts have interpreted such provisions as setting the measure of damages, not as precluding them. *Magar v. Lifetime, Inc.* (1958), 187 Pa.Super. 143, 144 A.2d 747.

■ We believe that when the four contracts comprising the agreement are read together they fall far short of the great particularity and clear, direct and unmistakable language required by the Pennsylvania courts if the Bonus Penalty Agreement was intended to supplant Inland's remedies for breaches of contract. Accordingly, Koppers fails on this issue. Koppers' additional assertion that the court injected a negligence theory (tort) into the case in ruling on the motion to correct errors misconstrues the import of what occurred. Negligence, in addition to creating a possible action in tort, can create an action for breach of contract where there is a contractual duty to use reasonable care. *See, e.g., Flint & Walling Mfg. Co. v. Beckett* (1906), 167 Ind. 491, 79 N.E. 503. Here the various contracts imposed upon Koppers the obligation to use diligence. As referred to by the court, negligence simply connoted the failure to use diligence, a breach of contract.

There is an additional, and alternative, ground for reaching our result. At the conference to settle the final jury instructions, Koppers originally objected to Inland's tendered instruction which would have told the jury that the Bonus Penalty Agreement was not Inland's sole remedy for cost overruns. Koppers stated that it would still object if the instruction were changed to state that the Bonus Penalty Agreement was not Inland's sole remedy for breach of contract. Then, however, Koppers suggested that the instruction be further modified to provide, "I instruct you that the bonus penalty agreement is not Inland Steel's sole remedy for breach of contract. The bonus penalty agreement is Inland Steel's sole remedy for overruns as defined in that agreement." When this

amendment was accepted Koppers' counsel did not renew any objection and, instead, stated "That's fair enough."

■■ Indiana still requires that in order to preserve error on the giving of an instruction a specific objection must be stated thereto before the jury retires. Indiana Rules of Procedure, Trial Rule 51(C). In addition, we adhere to the doctrine that a party who causes or induces a trial court to commit error may not secure a reversal on appeal on account of the error thus committed. *Smith v. State* (1984), Ind., 465 N.E.2d 1105, 1115–16; *Marotta v. Iroquois Realty Co.* (1980), Ind.App., 412 N.E.2d 797, 801. Because Koppers permitted the jury to be so instructed without objection, it cannot now be heard to complain.

■ Koppers next argues that Inland was not entitled to recover $3.8 million of the award representing excess engineering charges. The evidence favoring the verdict disclosed that the lump sum contract price included 44,000 blast furnace engineering man days at $148 per man day. However, when the contracts were executed Koppers had internal information indicating far more man days would be required. It ultimately billed Inland for over 100,000 man days of engineering on the blast furnace. Inland's witness Manzi testified that apart from asserted design changes Koppers needed in excess of 72,000 man days to do the engineering it proposed to do in 44,000 man days. The difference, 26,000 man days, at the per diem rate of $148 equals something more than the $3.8 million. The evidence thus sustains the award. Koppers now seeks to avoid the impact of that evidence by contending that "no evidence suggested that Koppers violated any contract promise by virtue of these facts." Koppers is in no position to make that assertion at this juncture. Without objection it permitted the court to instruct the jury that if it found for Inland, damages recoverable were to include "excess engineering man days, if any." (Transcript, p. 4866) It may, therefore, not now complain. *Smith supra; Marotta, supra.* The instruction established the law of the case.

Koppers next challenges the court's refusal to give its tendered instruction No. 2, refusal to give the fourth paragraph of its tendered instruction No. 6 and the court's giving of the instruction previously referred to in which it was stated that the Bonus Penalty Agreement was not Inland's sole remedy for breach of contract.

As previously stated, Koppers has waived any error in the instruction given by the court since it indicated acceptance and stated no objection to the giving of the instruction in its final form.

Koppers has, additionally, waived any claim of error concerning its tendered instruction No. 6. First, it does not argue error in refusal to give the entire instruction, yet it is clear that under Indiana law unless the court is obliged to give the instruction exactly as requested, it does not commit reversible error in rejecting it. *Hahn v. Ford Motor Co.* (1982), Ind.App., 434 N.E.2d 943, 957. No argument is presented that the balance of the instruction, in addition to the fourth paragraph, was required to be given. Secondly, the portion of the instruction urged by Koppers was in conflict with, or at least confusing when read in conjunction with, the modified instruction concerning breach of contract and the bonus penalty agreement which was consented to by Koppers. It was not error to refuse the instruction.

For substantially the same reasons no error is presented in the court's refusal to give Koppers' tendered instruction No. 2. This instruction would have told the jury that Inland had eight specific obligations under its agreement with Koppers. Koppers argues that it was prejudicial error not to instruct the jury on parts 1, 2 and 3 of the tendered instruction and asserts these parts were not covered by any other instructions.

It, however, again fails to argue the propriety of the entire instruction as tendered. It has therefore failed to establish error. In fact, it appears that the instruction might have been rejected as argumentative and misleading since it would have told the jury that Inland was obligated to pay $8,000,000 in three set fees when Inland's liability therefor was one of the issues before the jury. The court did not err in refusing the instruction as tendered and Koppers tendered no modified version.

Koppers next challenges the assessment of damages. It asserts several reasons why it believes Inland's claim of labor cost overrun amounting to $67,440,520 was erroneous. It also contends that the award of $2,750,000 for field changes necessitated by Koppers' faulty engineering had no basis in the proof.

Inland called as an expert witness Joseph Manzi on the damages it felt it had sustained. Manzi is an engineer and management consultant with experience in analyzing construction contract disputes. Manzi testified concerning his qualifications and his manner of evaluating the project and its problems. Several exhibits prepared by Manzi were used to assist the jury in explaining his conclusions. It was his opinion that the damages incurred for excessive labor costs totalled in excess of $67,000,000 [1] and that damages for excessive labor and excess engineering charges together totalled in excess of $71,000,000.

Koppers asserts Manzi's conclusions were in error for the following reasons: (1) Manzi, himself, characterized the labor overrun as "inexplicable," and if it was inexplicable then there was no basis for finding Koppers liable.[2] (2) Manzi admitted that his damage figure was a function of the target (estimated) cost and final cost. To the extent that damages might be attributable to an unreasonably low esti-

---

1. Manzi testified orally that in his opinion the unjustified labor overruns totalled "a little bit over $67,000,000." Plaintiff's Exhibit 116, which was admitted and explained his analysis, gave the precise total of $67,440,520.

2. Manzi did use the term, but when taken in context the jury could well have concluded that he was simply saying that the substantial labor cost overruns were inexplicable (not explainable) on any reasonable basis other than lack of diligence on the part of Koppers.

mated cost in the beginning, they should not be allowed. (3) Because Manzi's line-by-line analysis contained some blanks where he could not secure the necessary information there was necessarily error in his calculations. (4) Manzi's analysis was arithmetically unsound because it assumed a direct relation between the cost of materials and the cost of labor that did not vary from trade to trade. (In essence he testified that where the cost of materials increased 50% in the actual construction of a project, only a similar increase should be reasonably expected in the cost of construction unless construction occurred out of sequence, involved tear down and rebuild, or changes ordered by the customer during the course of the construction.)

The critical flaw in all these arguments is that they are misdirected.

■ The rule has long been established in this state that when evidence (which might have been excluded over proper objection) is admitted without objection, its probative value is for the jury to determine. *Klingler v. Ottinger* (1939), 216 Ind. 9, 17, 22 N.E.2d 805, 809; *Charlie Stuart Oldsmobile, Inc. v. Smith* (1977), 175 Ind. App. 1, 369 N.E.2d 947.

When at trial Manzi was asked his opinion on damages there was no objection. When his explanatory exhibit was offered there was only the general objection that the exhibit was irrelevant. Such an objection preserves nothing for appellate review. *Beaty v. Donaldson* (1964), 136 Ind.App. 269, 200 N.E.2d 233.

Thus, Manzi's expert opinion on the amount of damages was admitted in evidence without specific objection. It was then for the jury to determine its probative force. Under such circumstances Koppers' arguments necessarily are limited to attacking the weight to be given his opinion testimony. They therefore, at this juncture, do no more than seek a reweighing of the evidence. That is not our function.

Koppers argues that the $67.4 million damage figure found by Mr. Manzi included a component for which no damage was recoverable. Relying upon cases where an estimate was given but no limitations were placed upon the cost of construction,[3] Koppers asserts that estimates are inherently imprecise and failure to meet the estimate cannot be a breach of contract. Therefore, it argues, since Manzi could not determine whether some of his damage figure was attributable to underestimating, the award should not stand.

In the agreements here executed by the parties the "estimates" were more than merely collateral guesses concerning costs of construction. The Bonus Penalty Agreement was structured upon them. Detailed provisions concerned how the contract price might be varied. Indeed, Koppers' president testified that if Koppers had misestimated the amount of craft labor it would take to build the job, Koppers would be responsible for that. We believe it was proper for the jury to determine the weight to be given the evidence and the effect of Koppers' failure to use diligence in arriving at the contract cost figures, if it determined that there was such a failure.

Koppers also cites *Connor v. Jones* (1945), 115 Ind.App. 660, 59 N.E.2d 577 for the proposition that testimony which is opposed to the laws of nature or which is clearly in conflict with principles established by the laws of science is of no probative value and a jury may not rest its verdict thereon. We agree with *Connors*, but point out that the same paragraph quoted by Koppers continues:

"However, where a court cannot say as a matter of law that the testimony of a witness is contrary to scientific principles, the law of nature or the physical facts, *the question of whether such testimony does so conflict is one of fact for the jury to determine.*" (our emphasis) 115 Ind.App. 670, 59 N.E.2d 577.

The two contentions raised by Koppers in this regard concern the blank lines (missing

---

3. *Kalen v. Steele* (Mo.App.1960), 341 S.W.2d 343; *Cobb v. Thomas* (Tex.Civ.App.1978), 565 S.W.2d 281; and *Gallivan Bldg. Co. v. S.H. Kress & Co.* (1922), 120 S.C. 502, 113 S.E. 342 are cited.

data) in Manzi's analysis and the assertion that his analysis was arithmetically unsound.

Manzi's own testimony admitted his data was incomplete. He based his calculations on documents secured from Koppers and they did not contain all the necessary information. (While there was no direct testimonial link, there was evidence adduced that Koppers had instructed its people to keep no record of certain changes relating to mistakes in the field.) However, he also testified that he believed his analytical approach was superior to that of Koppers and that his analysis by subfacility would capture the appropriate information even though that information may have been miscoded in the field. Thus, he asserted his result would be valid.

As to the mathematical infirmity, Koppers does not contend there is error in the form of $2 + 2 = 5$. Instead, it contends that the model used by Manzi leads to incorrect results and suggests an alternative model. It proposes that instead of calculating by subfacility, Manzi should have calculated results for each account line. On this issue Manzi testified to the contrary urging that his method was the better one and that Koppers' approach was vulnerable to error if labor or materials were miscoded in the field.

In sum, the errors Koppers asserts are not as a matter of law contrary to the laws of science and mathematics. It was therefore properly within the jury's province to credit the opinion of Mr. Manzi.

Finally concerning its attack on damages, Koppers asserts there was no evidence to support $2.75 million of the judgment as the cost of field work necessary to correct Koppers' engineering errors.[4]

■ There was considerable evidence adduced at trial that many field changes were necessitated by engineering errors and omissions. There was evidence that Koppers instructed its people not to keep records of field changes showing engineering errors. There was evidence that Inland was billed and paid for $3.6 million in field changes and a reasonable inference that this included field changes occasioned by engineering errors on the part of Koppers. In addition, there was substantial evidence that Koppers concealed many of its engineering errors from Inland and ordered its employees not to keep records of them. When a defendant's own wrongful conduct creates uncertainty as to the exact amount of damages, the defendant will not be heard to complain of that uncertainty. *Eastman Kodak Co. v. Southern Photo Materials Co.* (1927), 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; *City of Ft. Wayne v. Capehart-Farnsworth Corp.* (1957), 127 Ind.App. 412, 424, 142 N.E.2d 442, 448. The jury's award of $2.75 million was within the evidence. No reversible error has been shown.

■ Koppers also contends that under the contract its only liability for engineering errors was to have the engineering drawings corrected without charge and therefore it was not liable for the field changes created or required as a result of the engineering errors. We disagree.

The Engineering Agreement provided that Koppers warranted the work would be free from all defects or faults of design or engineering, and that:

> "Engineering and design errors shall be corrected at no change in the Contract Price, but Koppers shall have no other liability under the contract for such errors."

Under Pennsylvania law such a contractual limitation limits damages to the cost of correcting the defects. *Magar v. Lifetime, Inc.* (1958), 187 Pa.Super. 143, 144 A.2d 747. Thus, to the extent that the field changes were necessary to correct errors that had been made in construction by following the erroneous engineering or to the

---

**4.** The jury verdict simply found $73,950,000 due Inland on its claim and $10,048,000 due Koppers on its counterclaim. The parties, however, do not dispute the three elements of Inland's claim or that the evidence as to any element must have been sufficient for the verdict to stand. Accordingly, we have considered the separate components.

extent that the changes required by the corrected engineering would increase the contract price to be paid by Inland, such amounts were properly recoverable. The jury was instructed that Inland could recover as an element of damages the "cost of field changes resulting from engineering errors, if any." While Koppers asserts that it objected at trial to the court's failure "to enforce this part of the contract" no challenge to the court's instruction has been presented on appeal.[5] Koppers has failed to demonstrate reversible error.

Koppers presents two more arguments. First, it charges that it was denied a fair trial because of the improper argument of counsel for Inland. At only one point during final argument did Koppers offer an objection: that Inland's counsel was going beyond the issues. This objection was sustained. Koppers did not at any point in the argument seek an admonishment of the jury or request a mistrial. It has therefore waived its contention. *Spratt v. Alsup* (1984), Ind.App., 468 N.E.2d 1059, *transfer denied; Kelley v. Hocutt* (1955), 125 Ind. App. 617, 128 N.E.2d 879.

Koppers seeks to avoid this result by citing to cases where the court has reversed for misconduct of counsel despite an apparent failure to move for a mistrial. Representative of these decisions are *Perry, etc. Stone Co. v. Wilson* (1903), 160 Ind. 435, 67 N.E. 183 where counsel's objections to improper argument were overruled by the court; and *Troxel v. Otto* (1972), 153 Ind.App. 437, 287 N.E.2d 791, where counsel persisted in attempting to influence the jury with irrelevant and prejudicial comments after the court had repeatedly ruled such conduct improper.

The present case is unlike *Wilson* since the court here sustained the only objection made by counsel. It is distinguishable from the situation recognized in *Troxel* since counsel did not violate repeated admonitions by the court. Indeed, the argu-

ment was not as egregious as counsel would now urge. This trial was hard fought and thoroughly tried. Koppers made one objection during final argument and it was promptly sustained. It did not request a mistrial or admonishment at the time and under the facts present it may not now be heard to complain.

Finally, Koppers argues that it should have been awarded prejudgment interest on the $8 million base fee asserted as part of its counterclaim as "a liquidated, ascertained, itemized amount." It cites IC 24–4.-6–1–103 which provides:

"Interest at the rate of eight percent (8%) per annum shall be allowed:

(a) From the date of settlement on money due on any instrument in writing which does not specify a rate of interest and which is not covered by IC 24–4.5 [24–4.5–1–101—24–4.5–6–203] or this article;

(b) And from the date an itemized bill shall have been rendered and payment demanded on an account stated, account closed or for money had and received for the use of another and retained without his consent."

We do not believe the statute applies. Under subsection (a) a "settlement" on the amount due under the contract must have been had to trigger application. In the statutory context "settlement" clearly connotes agreement as to the balance due under the instrument which, of course, did not occur in this case. Nor does it appear that the claim amounts to an account stated, account closed, or a claim for money had and received under subsection (b).

On the other hand, it is clear that the statute does not constitute the only authority for awarding prejudgment interest. It may be had where the damages sought are complete and ascertainable as of a particular time and the award is neces-

---

5. If Koppers' argument is intended as a challenge to the instruction it fails to comply with the mandate of Appellate Rule 8.3(A)(7): "When error is predicated upon the giving or refusing of any instruction, the instruction shall be set out verbatim in the argument section of the brief with the verbatim objections, if any, made thereto." The failure constitutes waiver. *Austin v. Thrapp* (1983), Ind.App., 444 N.E.2d 867.

sary to fully compensate the injured party for having been deprived of the use of the money owed. *Fort Wayne Nat. Bank v. Scher* (1981), Ind.App., 419 N.E.2d 1308 and cases cited therein.

The core question presented is the effect of Inland's recovery against Koppers upon Koppers' rights to prejudgment interest. Although prejudgment interest has often been considered in our decisions, we find no Indiana cases dealing with this question.

There is, however, authority elsewhere, and it appears that three alternative approaches have been considered [6] where the offsetting claims arise out of the same contracts.[7] *Giant Food, Inc. v. Jack I. Bender, etc.* (D.C.1979), 399 A.2d 1293.

The first treats the unliquidated counterclaim as making the whole claim unliquidated and thereby precluding prejudgment interest because the final (net) amount due cannot be mathematically ascertained. *See Hansen v. Covell* (1933), 218 Cal. 622, 24 P.2d 772 (dictum).

The second approach would award prejudgment interest on the entire liquidated [8] claim and then reduce the total by the amount found due on the unliquidated counterclaim. *See Hunt Foods, Inc. v. Phillips* (9th Cir.1957), 248 F.2d 23.

The third approach, known as the "interest on the balance" rule, allows interest only on the difference between the amount of the liquidated claim and the amount of the counterclaim.

Analyzing these approaches the D.C. Court of Appeals in *Giant Food, Inc.* rejected the first approach as too artificial

and noted that the second, or "interest on the entire claim" rule was usually applied in cases where the counterclaim did not directly concern the plaintiff's claim; that is, where it arose out of a collateral matter. 399 A.2d 1302.

Noting that each party was essentially indebted to the other on the respective claims during the time in question and recalling that the purpose of prejudgment interest is to compensate a party for having been deprived of the use of money, the court concluded that prejudgment interest should properly be awardable only upon the balance due. Only on that amount had the plaintiff legally suffered a loss of use.

■ A number of other courts have agreed.[9] Prejudgment interest should be recoverable only upon the balance due where the defendant was entitled to an offset arising out of the same transaction. *See, e.g., Hollon v. McComb* (Wyo.1981), 636 P.2d 513; *Hayer v. Nat'l. Bank of Alaska* (Alaska 1980), 619 P.2d 474; *Fairway Builders, Inc. v. Malouf Towers Rental Co.* (1979), 124 Ariz. 242, 603 P.2d 513.

■ We also agree that this is the better rule, and the one applicable in Indiana. The court did not err in refusing to award Koppers prejudgment interest on its $8 million claim since it secured no net recovery and under the evidence it owed Inland on Inland's unliquidated claim during the time Inland was liable for the contract fee.

No reversible error has been established.

Affirmed.

STATON, P.J., and HOFFMAN, J., concur.

---

**6.** The decisions typically deal with the situation where the party seeking prejudgment interest has secured a net recovery after some reduction of his claim upon a set off or counterclaim of the other party. 

**7.** *See Fairway Builders, Inc. v. Malouf Towers Rental Co., Inc.* (1979), 124 Ariz. 242, 603 P.2d 513. Since that is clearly the situation before us we exclude from consideration here what the rule should be where the counterclaim involves a purely collateral claim.

**8.** We recognize that the claim need not be truly liquidated to entitle one to prejudgment interest.

We use the term herein for ease of reference to encompass those types of claims upon which prejudgment interest might be properly awarded.

**9.** A number of federal courts treat prejudgment interest as discretionary with the court based upon equitable principles. *De La Cruz v. Pruitt* (D.C.Ind.1984), 590 F.Supp. 1296. Thus, under the federal rule it may be denied when its exaction would be inequitable. *Ralston Purina Co. v. Parsons Feed & Farm Supply, Inc.* (8th Cir. 1969), 416 F.2d 207.