John Richard WILLOUGHBY,
Appellant (Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–8705–CR–461.

Supreme Court of Indiana.

April 10, 1990.

Nancy L. Broyles, McClure, McClure & Kammen, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Richard C. Webster, Deputy Atty. Gen., Indianapolis, for appellee.

DICKSON, Justice.

Patricia McCaslin, an Indianapolis police officer on medical leave, disappeared on November 28, 1983. Her personal effects and car were found in the following days. Two years later in 1985, her skeletal remains were discovered in a wooded area near the Indianapolis airport. Her death resulted from three fractures in the facial area caused by blunt-force injuries. The defendant was convicted of murder, felony murder, robbery, and confinement. He received consecutive enhanced sentences of sixty years for murder, fifty years for robbery, and twenty years for confinement. In this direct appeal, the defendant's issues have been grouped as follows:

1) jury selection;
2) general confession admissibility;
3) corpus delicti;
4) polygraph results; and
5) sentencing.

## 1. Jury Selection

The defendant claims that the trial court erred in refusing to dismiss for cause a prospective juror who recalled the media coverage of the victim's disappearance in 1983 and the defendant's arrest in 1985. He asserts that the juror's responses on voir dire indicate that she could not fairly decide the case.

■ "The function of the voir dire is to ascertain whether or not the prospective juror can render a fair and impartial verdict in accordance with the law and the evidence." *Zachary v. State* (1984), Ind., 469 N.E.2d 744, 747. *Accord Murphy v. State* (1984), Ind., 469 N.E.2d 750. The grant or denial of a challenge for cause to a prospective juror is within the trial court's discretion, which will be reversed only where the decision is illogical or arbitrary. *Woolston v. State* (1983), Ind., 453 N.E.2d 965.

■ On individual voir dire, the prospective juror stated that she vaguely recalled media coverage of McCaslin's disappearance, the discovery of her remains by a hunter two years later, and the arrest of a suspect. However, she also stated, "I am not sure enough of those recollections to let them sway me." She added that she was "fairly certain" that she would not consider her recollections in assessing the case, although it was very possible that hearing the evidence could spur her memory.

From the prospective juror's responses, the decision of the trial judge denying the defendant's challenge for cause does not constitute an abuse of discretion.

## 2. General Confession Admissibility

The defendant claims that the trial court erred in admitting his audiotaped confession of December 13, 1985, because it resulted from coercive tactics and an involuntary waiver of his rights. After the trial court in a pre-trial hearing denied his motion to suppress the confession, the defendant objected at trial to its admission. He contends that before the taped interview he requested an attorney and that he asked to call his wife to see if she had obtained an attorney, but was not allowed to call his wife and was not provided with an attorney. The defendant also contends that his confession was involuntary because the police threatened him with the electric chair, did not offer him anything to eat, and did not inquire about the effect of his medication on his ability to think.

■ To admit a confession into evidence, the State must prove to the trial court beyond a reasonable doubt that the defendant intelligently and knowingly waived his rights to not incriminate himself and to have an attorney present. *Collins v. State* (1987), Ind., 509 N.E.2d 827. On review, this Court does not reweigh the evidence, but rather determines whether there was substantial evidence of probative value to support the finding that the confession was voluntary. *Id.*

At the pre-trial hearing on the motion to suppress, both parties presented evidence on the voluntariness of the defendant's

taped statement, in which he admitted to striking and confining the victim and to taking her car. On December 7, 1985, the defendant took a polygraph examination and gave a statement to detectives Wilson and Layton. Five days later, Detective Layton contacted the defendant and asked him to return to the police station for a second interview. That night the defendant and his wife discussed the possibility of retaining an attorney, but reached no decision.

On the following day, December 13, 1985, the defendant went to the police station, arriving at 3:15 p.m. He had not eaten since before noon. After a brief discussion with detectives Wilson and Layton, the defendant was conducted to a room to take a polygraph examination. The examining officer in the presence of Detective Wilson advised the defendant of his rights. The defendant stated that he understood them and wished to waive them. After the conclusion of the examination, the defendant was again advised of his rights by Wilson and Layton and thereafter signed a waiver-of-rights form at 6:55 p.m. The defendant read the document and acknowledged that he understood his rights. Detectives Wilson and Layton then questioned the defendant for about one hour and forty-five minutes. During this time coffee was provided for the defendant. Prior to making the taped statement, the defendant asked that he be allowed to call his wife when the statement was over. After the audiotape recorder was started, the detectives again advised the defendant of his rights, and he again stated that he wished to waive them. When the recorded interview was completed, the detectives learned that the defendant's wife had tried to contact the defendant earlier in the evening. According to the defendant's wife, she repeatedly called and went down to the station twice in an effort to talk with her husband about retaining an attorney, but was told that no messages could be taken to him. Shortly after his arrest, the defendant was allowed to call his wife around 10:30 p.m.

At the suppression hearing, the detectives denied that the defendant requested an attorney. Detective Layton denied that he threatened the defendant with the possibility of facing the electric chair. The defendant presented evidence that on the day of the confession he was taking medication for a bronchial condition. However, he had last taken the medicine around noon and could not show that it or its absence affected his ability to think. The detectives were unaware of the defendant's medication.

■ The evidence reflects that the defendant was advised of his rights three separate times on December 13, 1985. In each instance, including one on tape, the defendant stated that he understood his rights and wished to waive them. He also signed a waiver-of-rights form, which tends to support the trial court's ruling. *Speed v. State* (1986), Ind., 500 N.E.2d 186. The detectives testified that the defendant never requested an attorney. The evidence supporting the ruling also shows that the defendant was not subjected to threats or the withholding of food. Lastly, the defendant's medication does not appear to have affected his decision-making abilities. We therefore find that there was ample evidence before the trial court to support the conclusion that the defendant's confession was voluntary. The trial court did not err in admitting the confession.

### 3. Corpus Delicti

When the State called David Matson to testify about the defendant's admissions of guilt to him while both were in jail, the defendant objected that the State had not proved the corpus delicti of each of the crimes. By agreement, the objection extended to the following witness, Detective Layton, who testified about the defendant's taped interview. The trial court overruled the defendant's objection. Matson then related the defendant's statements, which described how the defendant took the victim in her car to a remote area, struck and bound her, and then drove off with her car. During the examination of Detective Layton, the defendant's taped interview was presented to the jury. The defendant claims that the trial court erred in admitting his admissions and taped interview

because the prerequisite for their admissibility, independent evidence corroborating the commission of the crimes, was wholly lacking.

The defendant's claim presents the difficult matter of applying the corpus delicti rule to a confession or admission of guilt where the defendant faces multiple charges for several acts committed within a criminal episode.

■ In Indiana, to support the introduction of a defendant's confession into evidence, the corpus delicti of the crime must be established by independent evidence of 1) the occurrence of the specific kind of injury and 2) someone's criminal act as the cause of the injury. *Hudson v. State* (1978), 268 Ind. 310, 313, 375 N.E.2d 195, 196. Most states have a similar requirement. *McCormick on Evidence* § 145 at 366 (E. Cleary 3d ed. 1984). The corpus delicti rule arose from judicial hesitancy to accept without adequate corroboration a defendant's out-of-court confession of criminal activity. *Brown v. State* (1958), 239 Ind. 184, 190, 154 N.E.2d 720, 722 (plurality opinion), *cert. denied* (1960), 361 U.S. 936, 80 S.Ct. 375, 4 L.Ed.2d 360; *Griffiths v. State* (1904), 163 Ind. 555, 72 N.E. 563. The primary function of the rule is to reduce the risk of convicting a defendant based on his confession for a crime that did not occur. *Cambron v. State* (1975), 262 Ind. 660, 665, 322 N.E.2d 712, 715. Other justifications include the reduction of confessions produced by coercive tactics and the encouragement of thorough police investigations. *State v. Parker* (1985), 315 N.C. 222, 337 S.E.2d 487; Note, *Confession Corroboration in New York: A Replacement for the Corpus Delicti Rule*, 46 Fordham L. Rev. 1205, 1207–10 (1978); Comment, *California's Corpus Delicti Rule: The Case for Review and Clarification*, 20 UCLAL Rev. 1055, 1087–92 (1973); *Developments in the Law—Confessions*, 79 Harv.L.Rev. 938, 1082–84 (1966). The extent to which the rule actually furthers these goals has been seriously questioned, especially in light of developing procedural safeguards for voluntary confessions. *Parker*, 337 S.E.2d at 493–94

(rejecting corpus delicti rule in favor of federal "trustworthiness" rule in non-capital cases); *State v. Edwards* (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, 1056 (rule "supported by few practical or social-policy considerations"), *vacated in part* (1978), 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155, *followed in State v. Van Hook* (1988), 39 Ohio St.3d 256, 530 N.E.2d 883; *Daeche v. United States* (1918), 2d Cir., 250 F. 566, 571 ("That the rule has in fact any substantial necessity in justice, we are much inclined to doubt...."—Judge Learned Hand); *McCormick on Evidence, supra*, § 145 at 370–71; *Confession Corroboration, supra*, at 1233–41; *Developments in the Law—Confessions, supra*, at 1082–84 (among other shortcomings, the rule's requirement of an "independent determination that a crime has occurred is not by itself a sufficient reason for finding a confession reliable" because rule does not require connection of the defendant to crime confessed). Most federal courts and several state courts have adopted a more flexible "trustworthiness" requirement for confession corroboration. *Parker*, 337 S.E.2d at 495. In the past this Court has declined to adopt the "trustworthiness" rule. *Jones v. State* (1969), 253 Ind. 235, 248, 252 N.E.2d 572, 578–79, *cert. denied* (1977), 431 U.S. 971, 97 S.Ct. 2934, 53 L.Ed.2d 1069.

Strict adherence to the corpus delicti rule, in light of its declining utility, presents great difficulties in modern criminal law.

If conscientiously applied, the requirement—especially the *corpus delicti* formulation—contains fertile grounds for numerous arguments and complexities of application. Definition of the *corpus delicti* may have been a relatively simple task when crimes were few and concisely defined. But increased use of the criminal sanction has greatly increased the number of criminal offenses. Further, modern statutes tend to define offenses more precisely and in greater detail than traditional case law. Defining the *corpus delicti* has become more complex. Comprehensive definitions of the *corpus delicti*, if incorporated into the corroboration requirement, may impose an un-

realistic or at least unnecessary burden upon the prosecution.

*McCormick on Evidence, supra,* § 145 at 371.

■ We are persuaded that where a defendant confesses to several crimes of varying severity within a single criminal episode, strict and separate application of the corpus delicti rule to each offense adds little to the ultimate reliability of the confession once independent evidence of the principal crimes is introduced. The confession at that point has been substantially corroborated. In such a case the confession stands as direct evidence of each crime, even those not separately corroborated, if the independent evidence establishes the corpus delicti of the principal crime or crimes.

■ Turning to the facts in the present case, for the confessions to be admissible the independent evidence must have established the corpus delicti of the principal crimes of murder and robbery, which are both class A felonies, although not necessarily criminal confinement, a class B felony. The independent evidence need not be shown beyond a reasonable doubt nor demonstrate prima facie proof as to each element of the charged offense, but must support an inference that the crime was committed. *Jones,* 253 Ind. 235, 252 N.E.2d 572, *followed in Fleener v. State* (1980), 274 Ind. 473, 412 N.E.2d 778. There must be "some evidence of probative value aside from the confession" that tends to prove the commission of the crime. *Parker v. State* (1949), 228 Ind. 1, 6, 88 N.E.2d 556, 558. The corroborating evidence may be circumstantial. *Fleener,* 274 Ind. 473, 412 N.E.2d 778. The State is not required to prove the corpus delicti before the confession is admitted, provided the totality of independent evidence presented at trial establishes it. *Douglas v. State* (1985), Ind., 481 N.E.2d 107. Once properly admitted, a confession is direct evidence of guilt of the criminal activity admitted. *Hudson,* 268 Ind. at 313, 375 N.E.2d at 197.

Aside from the defendant's taped interview and his statements to Matson, the evidence adequately established the commission of murder and robbery by someone. Patricia McCaslin, the victim, spent the afternoon of November 28, 1983, at her home with one of her daughters, Nancy. Around 5:00 p.m., McCaslin drove Nancy to a friend's house after agreeing to pick Nancy up later that night. McCaslin, who operated a stand at a flea market, was carrying several hundred dollars in cash from a recent sale and was wearing two rings. Nancy was unable to reach her mother by phone later that evening to have her mother pick her up. McCaslin's other daughter, Theresa, went to McCaslin's home around 11:00 p.m. to pick up a shirt McCaslin had for her. Theresa and McCaslin had arranged to meet at that time. Theresa discovered that McCaslin and her car were missing.

On November 30, McCaslin's purse was found, but only a few coins. Her car was found the next day at a convenience store parking lot, where it had been observed since 6:00 a.m. on November 29, 1983. Some of the car tires had mud on them. Her purse and car were found respectively on the south and southeast sides of the city.

Two years later, on November 29, 1985, McCaslin's skeletal remains were discovered scattered over a lightly wooded area near corn fields and an abandoned house. Accessed by a dirt road, this area was on the southwest side of the city near the airport. A search with metal detectors failed to disclose her rings. Deteriorated clothing found on and near the torso matched the clothing that McCaslin was wearing on the night of her disappearance. A double-looped, knotted electric cord with human hair in the knot was recovered between her skull and torso, which were separated by several feet. The hair was consistent with McCaslin's race and hair color. The pathologist was reasonably certain that McCaslin died as a result of non-accidental blunt-force injuries to her face, which fractured her skull.

■ Evidence of an identifiable body bearing the marks of a non-accidental death adequately establishes the corpus delicti of murder. *Jones,* 253 Ind. 235, 252 N.E.2d 572; *Parker,* 228 Ind. 1, 88 N.E.2d

556. The pathologist's testimony provided such evidence in the present case.

■ An inference of a forcible taking of McCaslin's property arises from the conjunction of several circumstances: 1) the victim's disappearance and her violent death; 2) the absence of her money and rings; and 3) her body being found in an area distant from the locations of her car and purse. *See Graham v. State* (1984), Ind., 464 N.E.2d 1 (corpus delicti of robbery established where elderly victim's stabbed body was found with little money after she and a young man had withdrawn several thousand dollars from her account); *Hayden v. State* (1964), 245 Ind. 591, 199 N.E.2d 102, *reh'g denied*, 245 Ind. 591, 201 N.E.2d 329, *cert. denied* (1966), 384 U.S. 1013, 86 S.Ct. 1926, 16 L.Ed.2d 1034 (corpus delicti of robbery established where badly injured elderly victim found without purse and money known to be carried by her, and purse later found without money). From this independent evidence, we find that the corpus delicti of robbery was shown.

The separate corroboration of criminal confinement was substantially weaker. The only physical evidence of a non-consensual confinement was the double-looped, knotted cord with human hair in the knot found near the victim's skull. While the knotted cord, taken with the other circumstantial evidence, tends to prove the confinement of McCaslin at some point during the criminal episode, such independent proof of the corpus delicti of criminal confinement was not needed because of the adequate corroboration of the principal crimes discussed in the defendant's confessions.

We find adequate corroboration by independent evidence. The defendant's admissions to Matson and his taped interview were fully admissible as direct evidence of each crime.

### 4. Polygraph Results

The defendant asserts that the trial court erred in permitting the State to present rebuttal evidence on two polygraph tests taken by the defendant. The first test was administered on December 7, 1983, and the second was given December 13, 1985, just prior to his confession. The trial court granted the State's pre-trial motion in limine, which sought to prevent any references to the polygraph examinations.

During direct examination, the defendant's attorney asked questions of the defendant regarding his contact with the investigating officers in 1983. When, following a long narrative answer, counsel asked "what happened next," the defendant replied, "I come in. I made a statement and I took a polygraph test." Record at 1926. The State did not object to this reference. In subsequent direct examination the defendant described how the detectives contacted him in December 1985, after the discovery of McCaslin's remains; the defendant mentioned being advised by his employer that Detective Layton had called for him. In response to his counsel's question, "Alright, what did you do?", the defendant answered:

I asked her [his employer] what [Detective Layton] wanted and she said he wanted you to come in and take a polygraph test first thing in the morning.

His counsel pursued the matter further:

Q. Did you contact Officers Layton and Wilson?

A. Yes sir I did.

Q. Alright, and did they request you to come in downtown?

A. Yeah.

Q. Other than requesting you to come downtown, did you talk about in that conversation, about the case?

A. Just a little bit.

Q. Alright, what was said?

A. Well, I just asked him why he had called and he said that the brass was on his rear end.

Q. Who is "he" again?

A. Detective Layton.

Q. Alright, go ahead.

A. No, excuse me. It was Detective Wilson.

Q. Alright.

A. ——and [Detective Wilson] said "I done talked to your boss and she would agree to let you off tomorrow morning to let you come in and take a polygraph", which actually was going to take my whole day off, see, and I told him, I said "There is no way I can take the whole day off just to come in and take a polygraph test." "Another thing," I said "I have have done passed a polygraph" and he said "Yes, I know you have", you know.

Record at 1938.

■ At this point the State objected and pointed out that the defendant's reference violated the trial court order against mention of the polygraph examinations and also misstated the result of the 1983 polygraph. Over strenuous defense objection, the trial court permitted the State on rebuttal to show that the results of the 1983 polygraph were inconclusive, that the defendant failed the 1985 polygraph, and that Detective Wilson never said the defendant passed the 1983 polygraph.

The defendant claims the polygraph results remained inadmissible because his counsel did not specifically elicit the references to the polygraph. He further asserts that even if the references opened the door to the results of the 1983 test, the results of the 1985 test remained inadmissible because the defendant did not refer to that polygraph.

"Absent some form of waiver or stipulation by the parties, the results of polygraph examinations administered to witnesses or parties are not competent evidence in criminal prosecutions." *Couch v. State* (1988), Ind., 527 N.E.2d 183, 185. Even mention that a polygraph examination was administered is inadmissible absent some form of waiver. *Swan v. State* (1984), Ind., 462 N.E.2d 68.

In *Sherry v. State* (1987), Ind., 511 N.E.2d 1049, this Court reversed a conviction where the State was wrongly permitted to introduce polygraph results in response to defense counsel's intense questioning of a police officer into the details of the police investigation. We stated that because the questioning made no "veiled reference" to polygraph examination the defendant did not "open the door" to the admission of the polygraph results. *Id.* at 1051. We found that no waiver occurred.

In contrast, the defendant in the present case personally, and in violation of a court order, testified that he passed a polygraph examination. While such testimony was not in response to veiled references, we find that in doing so the defendant introduced the topic. His statements could mislead the jury into thinking that his truthfulness was verified by a polygraph examination, when in fact there was evidence that its results were inconclusive. Such testimony further concealed his failure to pass a polygraph examination when questioned in 1985. "A defendant may not open an issue and have it closed at his convenience." *Kalady v. State* (1984), Ind., 462 N.E.2d 1299, 1309. Once the defendant opened the door to the proscribed evidence he waived any objection to the admission of the the polygraph results. The trial court did not err in permitting the State to present the polygraph results in rebuttal.

### 5. Sentencing

The defendant received consecutive and maximally enhanced sentences for the murder, robbery, and confinement convictions, for a total of 130 years. The defendant claims that the enhancements and consecutive sentencing impermissibly punish him for the death of a young girl in 1975.

At the sentencing hearing, the State presented evidence that in 1975 the defendant was involved with the death of a fourteen-year-old girl, Terry Darlington. The investigating officer testified that the defendant denied killing Darlington but admitted disposing of her body in a corn field, which was two miles from where McCaslin's remains were found in 1985. According to the defendant's statement to the officer, in September 1975, the defendant dropped Darlington off with a man known to him as Smokey. Darlington told the defendant that she'd call him if she needed a ride home. The next day the defendant met Smokey as the latter was driving to

the defendant's home. Smokey said that Darlington was ill and that the defendant should take her. The defendant saw Darlington in Smokey's car with her hands bound, but agreed to take her. Smokey and the defendant drove to another location to transfer Darlington to the defendant's car. After Darlington was placed in the defendant's car, he noticed that she didn't move and he could not feel her pulse. The defendant drove to an area near the airport with which he was familiar and dumped Darlington's body in a corn field. He later took Smokey to the body so Smokey could place Darlington's purse with the body. The defendant never called the authorities. Darlington's body was found, with hands bound, two months later. No criminal charges were filed against the defendant in the Darlington matter.

In addition to finding several aggravating circumstances, the trial judge made specific reference to the defendant's involvement in the Darlington matter:

> I find as another aggravating circumstance that the Defendant has been placed on probation at various times and has received lesser sentences that (sic) he could have received and that further crimes resulted. I find it as an extremely aggravating circumstance that by his own words to Detective Bruce, Defendant Willoughby left a girl named Terry Darlington in the same area, either dead or dying and in neither case, this one or the other one,—and the other one did not result in a case—I simply mean circumstance, no call was ever made to law enforcement agency or to any other person who could make a call to a law enforcement agency to advise them of the location of these bodies so that the families of Ms. Darlington and Ms. McCaslin could be somewhat relieved, at least to know where their deceased relatives were.

> \* \* \* \* \* \*

Obviously another aggravating circumstance is the lack of showing of any remorse for the death of either lady, one of which he caused as shown by the verdict of the jury and one of which he at least concealed.

Record at 2142–43.

The defendant claims that the trial judge erroneously enhanced his sentences as punishment for the death of Terry Darlington. He argues that under *Gambill v. State* (1982), Ind., 436 N.E.2d 301, a trial judge may not enhance a sentence to compensate for a crime for which it perceives that the defendant eluded lawful punishment. However, *Gambill* and its line of cases prohibit a trial judge from enhancing a defendant's sentence upon the judge's belief that the jury erred in not returning a verdict for a more serious crime. *Kirkley v. State* (1988), Ind., 527 N.E.2d 1116; *Darby v. State* (1987), Ind., 514 N.E.2d 1049; *Hamman v. State* (1987), Ind., 504 N.E.2d 276; *Hammons v. State* (1986), Ind., 493 N.E.2d 1250, *reh'g denied*, 496 N.E.2d 1284; *Wilson v. State* (1984), Ind., 458 N.E.2d 654; *Gambill*, 436 N.E.2d 301. The present case involves no such situation.

A trial judge may consider uncharged crimes as part of a defendant's criminal history, which is a statutory aggravating circumstance. *Stark v. State* (1986), Ind., 489 N.E.2d 43. In the present case, the trial judge could properly consider the defendant's involvement in the Darlington matter as evidence of being a criminal accessory after the fact, a violation of Ind. Code § 35–1–29–3 (repealed 1977; replaced by Ind.Code § 35–44–3–2). The defendant's concealment of the body and the circumstantial evidence of his intent to assist Smokey in evading punishment adequately establish the crime of being an accessory after the fact. *Tessely v. State* (1978), 267 Ind. 445, 370 N.E.2d 907 (elements of crime of accessory after the fact); *Taylor v. State* (1983), Ind.App., 445 N.E.2d 1025 ("assist" defined); *Moore v. State* (1983), Ind.App., 445 N.E.2d 576 (circumstantial evidence of intent). The sentencing statement indicates that the trial judge enhanced the defendant's sentences not as punishment for Darlington's death, but rather for his concealment of her body.

Furthermore, a trial judge is not limited to considering as aggravating cir-

cumstances those listed in the non-capital sentencing statute, Ind.Code § 35–38–1–7. *Parrish v. State* (1987), Ind., 515 N.E.2d 516. Under Ind.Code § 35–38–1–7(a)(3)(B), the trial judge may consider evidence of the defendant's character. The trial judge in the present case could therefore consider the defendant's involvement as evidence of his character. A trial judge may also consider a defendant's lack of remorse as an aggravating circumstance. *Ballard v. State* (1988), Ind., 531 N.E.2d 196.

In the present case, the trial judge did not err in finding as aggravating circumstances the defendant's concealment of Terry Darlington's body and his lack of remorse for her or for Patricia McCaslin, whom he killed.

The judgment of the trial court is affirmed.

SHEPARD, C.J., and GIVAN, J., concur.

DeBRULER, J., concurring and dissenting with separate opinion.

PIVARNIK, J., not participating.

DeBRULER, Justice, concurring and dissenting.

I concur in the first four sections of the majority opinion, but dissent to the fifth section relating to sentencing. The majority holds that, for purposes of sentencing, evidence of a defendant's prior conduct which may have been in violation of some criminal statute is essentially unrestricted. This holding goes too far. I.C. 35–38–1–7(b)(2) permits the sentencing court to consider the defendant's "history of criminal or delinquent activity." Criminal charges pending in four states have been considered relevant to show criminal activity. *Stark v. State* (1986), Ind., 489 N.E.2d 43. Five misdemeanor arrests also have such relevance. *McNew v. State* (1979), 271 Ind. 214, 391 N.E.2d 607. In my opinion, arrests are relevant, not to show criminal activity, but to show that the exercise of police authority over the person had no later deterrent effect upon that person's anti-social inclinations. *Chamness v. State* (1983), Ind., 447 N.E.2d 1086, 1088 (DeBru-ler, J., concurring in result). Arrests and charges concluding in acquittals are totally irrelevant to sentencing considerations. *McNew,* 271 Ind. at 221, 391 N.E.2d at 612.

A case much like the one before us today is *Griffin v. State* (1980), 273 Ind. 184, 402 N.E.2d 981. There, two Hooks stores were robbed in Indianapolis two days apart. The later one resulted in a charge and conviction. At sentencing upon that conviction, the court heard evidence of Griffin's participation in the earlier Hooks robbery, though there had been no charge of that. This Court upheld that procedure, but noted that Griffin had numerous previous felony convictions and that, under all the circumstances, the sentence was not manifestly unreasonable. Here, appellant has several prior convictions, two of which are for felonies. However, unlike the situation in *Griffin*, the Darlington case and this McCaslin case are separated by seven years. Both bodies were found on Indianapolis airport property, but that is a very large area and, in addition, there was no proof of the cause or time of death in the Darlington case. I find it contrary to notions of fundamental fairness to permit the State at a sentencing hearing to attempt to add years to a sentence by placing any number of uncharged crimes in issue and putting the defendant to his defense on each. I would return to what I consider to be the law prior to *Griffin*, namely that a police investigation must have resulted in an arrest or charge before proof of a crime not reduced to a conviction can be admitted at a sentencing hearing.