**Carlos O. OWENS, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 49S00–9908–CR–420.

Supreme Court of Indiana.

June 30, 2000.

Paul T. Fulkerson, Indianapolis, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Janet L. Parsanko, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

BOEHM, Justice.

Carlos O. Owens was convicted of murder and rape as a Class A felony. He was sentenced to fifty-five years for murder to be served consecutively with thirty years for rape. In this direct appeal he contends that the trial court erred in admitting his confession because (1) there was not sufficient corpus delicti of rape, and (2) the confession occurred after he requested an attorney and an attorney was en route to or waiting at the police station to see him. We affirm the judgment of the trial court.

**Factual and Procedural History**

Shortly after 11:00 a.m. on January 7, 1997, Bessie Boynton answered her phone and heard a male voice, which she later recognized as Owens', say, "Your daughter is dead, bitch. You better go over there and see about her." Bessie called her daughter Brenda. When no one answered, she asked her husband Arthur to go to Brenda's house. Arthur found his daughter dead in her house. Brenda had been stabbed thirty-seven times on the head, neck, shoulders, chest, abdomen, and arms. She died as a result of "[m]ultiple cutting and stabbing wounds."

Brenda's sister told Detective Mark Prater that Owens had recently seen Brenda. Prater made an appointment with Owens, who arrived at the police station at approximately 8:00 a.m. on January 9. Owens was accompanied by his mother and sister. Owens voluntarily provided fingerprints and then submitted to questioning by Prater. This questioning concluded at approximately 1:00 p.m. Owens denied any involvement in the killing. In the course of the interview, Owens agreed to submit to a polygraph, but before the polygraph

began he requested an attorney. Prater ceased questioning and left the room. When Prater reentered the interview room, Owens inquired about his mother. Prater informed Owens that she had left but would be returning, and Prater remained in the interview room. Owens then asked Prater, "What could happen to somebody that did this?" Prater responded that it would depend on the circumstances and that it was not his position as a detective to determine. Owens then said, "I did it." Prater left the room, retrieved his notepad, and returned to the interview room at 2:51 p.m., when he advised Owens of his Miranda rights.

Owens told Prater that he had called Brenda on the morning of January 7, told her he had lost his job, and then had gone over to her apartment. Brenda let him in and he followed her to the back bedroom where she was wrapping presents for her son's birthday. After telling Brenda that he wanted to "make love" to her, Owens retrieved a knife from the kitchen and instructed her to remove her panties. After intercourse, Brenda said, "Leave now and I won't tell anybody." Owens then "clicked," and stabbed Brenda in the chest. She went to the bathroom, saw she was bleeding, and ran to the living room. Owens ran after her, pushed her down, stabbed her in the back, and sliced the back of her neck. He then called her parents' house and told her mother, "Bitch, you better come check on your daughter."

After this unrecorded confession, Prater told Owens that he wanted to take a tape-recorded statement and went to another room to get a tape recorder. Soon after the tape-recorded statement began, Owens requested an attorney. Prater ceased questioning and placed Owens under arrest. The time of the aborted taped statement is 3:50 p.m.

Owens' uncle called Indianapolis attorney Richard Bucheri at approximately 3:30 p.m. Bucheri testified that he then called the Indianapolis Police Department and told Detective Prater that he had been retained to speak with Owens. Bucheri was told to go to the homicide office and arrived at approximately 4:00 p.m.

Owens was charged with murder, felony murder, and rape as a Class A felony. He filed a pretrial motion to suppress his statement to police, which was denied after two separate hearings. A jury convicted him of murder and rape, and found him not guilty of felony murder. The trial court sentenced him to fifty-five years for murder to be served consecutively with thirty years for rape.

## I. Corpus Delicti

██ Owens contends that the trial court erred in admitting his confession to rape because there is insufficient corpus delicti to support it. Owens is correct that in Indiana a crime may not be proven based solely on a confession but must be supported by "some independent evidence of the crime including evidence of the specific kind of injury and evidence that the injury was caused by criminal conduct." *Workman v. State,* 716 N.E.2d 445, 447 (Ind.1999). However, "where a defendant confesses to several crimes of varying severity within a single criminal episode, strict and separate application of the corpus delicti rule to each offense adds little to the ultimate reliability of the confession once independent evidence of the principal crime is introduced." *Willoughby v. State,* 552 N.E.2d 462, 467 (Ind.1990). Under these circumstances, a confession to other crimes in the same episode is admissible if there is independent evidence of the principal offense. *Workman,* 716 N.E.2d at 448.

██ Here, Owens confessed to both murder and rape. He does not contest the corpus delicti to support his murder confession. Indeed, Brenda was stabbed thirty-seven times and died as a result of multiple stab wounds. Because there is ample independent evidence of murder, Owens' confession to rape is admissible without independent evidence of that

**164**

crime. *See id.*; *Willoughby*, 552 N.E.2d at 467–68.[1]

## II. Admissibility of Confession

■■ Owens contends that his confession should have been suppressed because it occurred after he had requested an attorney and an attorney was either en route or waiting to meet with him. He does not explicitly state the basis of his claim, but cites Fourteenth Amendment cases.[2] Neither the facts nor the cases cited support this argument. Bucheri did not arrive at the police station until approximately 4:00 p.m., and Owens' confession had concluded before 3:50 p.m. Defense counsel acknowledged this at the conclusion of the suppression hearing, stating "it looks like Mr. Bucheri came late by a few minutes." Moreover, even had Bucheri been en route to or waiting at the police station during Owens' confession, neither the Fifth nor the Fourteenth Amendment requires suppression of a confession obtained after an attorney, unknown to the suspect, unsuccessfully seeks to intervene in an interrogation. *See Ajabu v. State*, 693 N.E.2d 921, 927 (Ind.1998) (citing *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Burbine*, 475 U.S. at 422, 106 S.Ct. 1135.

■ Nor was suppression required based on Owens' initial request for counsel. Prater stopped questioning Owens when he requested an attorney at the beginning of the polygraph interview. In *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." More recently, the Court reiterated that "*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities." *Minnick v. Mississippi*, 498 U.S. 146, 156, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). Owens initiated further communication by inquiring about his mother and the possible consequences for Brenda's murder. Owens then volunteered that he "did it," and Prater advised him of his Miranda rights before taking the full confession. The trial court did not err in admitting Owens' confession.

## Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and RUCKER, JJ., concur.

---

1. Owens suggests that *Willoughby* should not apply to his case because "there was absolutely no evidence of forced intercourse or that the victim had intercourse at all." Rather, he asserts that there is "substantial evidence that the crime did not occur." He notes that no sperm was found on the items tested from Brenda's home (including a condom), his fingerprints were not found on the condom wrapper, no foreign hairs were found in pubic combings of Brenda, and there was no evidence of forced intercourse. However, as the State points out, the crime of rape does not require ejaculation, *see* Ind.Code § 35–42–4–1 (1998), and a crime lab chemist testified at trial that it was typical in a rape case not to find foreign hairs capable of comparison.

2. Owens also mentions the Sixth Amendment as a basis for suppression of his statement. However, the Sixth Amendment right to a lawyer does not attach until "the formal initiation of adversary judicial proceedings." *Moran v. Burbine*, 475 U.S. 412, 432, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *accord Ajabu v. State*, 693 N.E.2d 921, 927 & n. 3 (Ind.1998). It does not apply here.