**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 29 2014, 9:58 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW J. McGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| RONALD WAYNE SHEWMAKER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 10A05-1401-CR-2 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE CLARK CIRCUIT COURT
The Honorable Daniel E. Moore, Judge
Cause No. 10C01-1302-MR-1

**September 29, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Ronald Wayne Shewmaker appeals his conviction and sentence for murder. Shewmaker raises two issues, which we revise and restate as follows:

I. Whether the trial court abused its discretion in denying his motion for mistrial;

II. Whether the court abused its discretion in sentencing him; and

III. Whether his sentence is inappropriate.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Shewmaker first met Lisa McQuirt at a strip or dance club, and they were later engaged to be married. Shewmaker was unaware that McQuirt was married and that she was also in a relationship with Norman Wolfe. Shewmaker gave McQuirt and her children money and gifts, including money toward a down payment for a car and a rental house so she could move out of the motel where she was living.[1]

In the early morning of February 18, 2013, Shewmaker visited a strip club where a friend of McQuirt told him that she had known McQuirt for a long time, that McQuirt was married, and that she had also scammed someone else. Shewmaker "was agitated" and "p----- off" and went to look for McQuirt. Transcript at 666. He first went to McQuirt's mother's house, found that McQuirt's car was not there, and then drove around Clarksville until he remembered another place he had previously dropped off McQuirt which he believed was the house of another dancer. At approximately 4:00 a.m., Shewmaker found McQuirt's vehicle parked near a duplex apartment unit.

---

[1] Shewmaker testified he gave McQuirt ten to twenty thousand dollars in total.

Wolfe and McQuirt, along with Jeremy Walker, Tesla Matthews, Anthony McGhee, McQuirt's daughter, and several other adults and children were inside Wolfe's apartment. Shewmaker was unsure which apartment unit McQuirt was in and knocked on the door of the unit immediately next door to Wolfe's unit. Walker and McGhee heard the knocking and opened the door. Shewmaker asked if McQuirt was there and stated that her car was out front. McGhee said that he did not know who McQuirt was or whose car was out front, shut the door, and went to tell Wolfe. Wolfe went to the door and opened it, and Shewmaker pointed at McQuirt's vehicle and asked if that was McQuirt's car and where McQuirt was located, and Wolfe told Shewmaker that he did not know McQuirt's car, that the vehicle had been parked there for several weeks, and closed or slammed the door on Shewmaker. Shewmaker took a knife out of his pocket and stabbed the four tires of McQuirt's vehicle to "[d]isable it so she couldn't drive it." Id. at 673. Wolfe told McQuirt "to go outside and talk to him," and McQuirt went outside. Id. at 112.

McQuirt approached Shewmaker, who was sitting in his truck, and Shewmaker fired four shots, one of which struck McQuirt in the chin and another struck her in the back. McQuirt was bleeding from the gunshot wounds, was able to walk or stumble inside the door of the apartment, and collapsed on the floor just inside the door. Shewmaker drove away, and Walker called the police. Police and emergency personnel arrived at the scene. McQuirt died as a result of the gunshot wounds. After leaving the location of the shooting, Shewmaker called his friend Ron House and stated "that he had made a mistake" and that "there was nothing he could do about" it, but that he was going

3

to go home and see his mom and dad.  Id. at 73-74.  House was concerned Shewmaker

was going to commit suicide and called the police.[2]

Shewmaker surrendered to Harrison County Officer Gary Gilley at his home.[3]

Officer Gilley permitted Shewmaker to sit down on a picnic table to smoke a cigarette

before transporting him to the jail.  Shewmaker asked Officer Gilley "is she dead," and

Officer Gilley answered that he did not know.  Id. at 268.  Shewmaker was transported to

the Harrison County Sheriff's Department, turned over to the detectives from Clarksville,

and transported to Clark County jail.  At the police station, Shewmaker was given his

Miranda rights, and he immediately invoked his right to remain silent.[4]  Police recovered

a bullet on the street, a bullet on the sidewalk, a bullet which had fragmented by a child's

bedroom, part of which was on the sill and part of which was between the two windows

in the window channel, and a bullet in front of a curve where it had impacted a vehicle.

On February 22, 2013, the State charged Shewmaker with murder.  Prior to trial,

Shewmaker filed a motion *in limine* requesting the court to issue an order instructing the

prosecutor and witnesses offering testimony on behalf of the State to refrain from making

any statements, comments, or questions during trial pertaining to, among other things, the

advisement of Shewmaker of his Miranda rights and Shewmaker's silence or refusal to

answer questions following the Miranda advisements, and the court granted the motion.

---

[2] Shewmaker testified, when asked why he called House, that Shewmaker was going to kill himself and wanted to let his friend know that he loved him.

[3] Shewmaker's parents told Officer Gilley that Shewmaker wished to surrender to him.  Officer Gilley was familiar with the Shewmakers and their business.

[4] The parties agreed that Shewmaker invoked his rights when he talked to Clarksville Chief Detective Darrel Rayborn.

4

A jury trial was held on November 5 through 8, 2013, at which the evidence included the testimony, among others, of Ron House, Officer Gilley, Chief Detective Rayborn, McQuirt's daughter, Walker, Wolfe, Matthews, McGhee, and Shewmaker. McQuirt's daughter testified that she knew McQuirt was seeing Shewmaker several times a week and talking to him every day, that McQuirt was also dating Wolfe at the same time, and that McQuirt was married to and living with her husband. She testified that Shewmaker brought McQuirt money and presents for McQuirt and her children, that there were times McQuirt pretended that her husband was her brother so that Shewmaker would continue giving her presents and money, and that McQuirt said not to mention Wolfe to Shewmaker. McQuirt's daughter also testified that, one or two weeks prior to the shooting, she heard Shewmaker say "if you don't give me what I want I will hurt you and your family," but she did not know what Shewmaker wanted. Id. at 332. She also testified that she and McQuirt would notice Shewmaker following them in his truck, drive by where they lived, or park near where they lived, and that this occurred "[m]ore at the end." Id. at 336.

Walker, Wolfe, and McGhee testified McQuirt did not have a gun at the time of the shooting. Walker indicated that McQuirt did not have a weapon on her when she came back into the apartment after being shot, that he never knew McQuirt to have a gun, and that he never saw a gun at the apartment. Wolfe testified that McQuirt described Shewmaker as "her sugar daddy." Id. at 169. Wolfe testified that McQuirt did not have a gun with her when she exited the apartment, that she did not have a gun when she stumbled back into the house, and that if she had a gun he would say so and "wouldn't try

to get myself caught up in the midst of catching any type of disciplinary action for just trying to keep that away from anybody else in the house." Id. at 176. On cross-examination, Shewmaker's counsel asked Wolfe if he told James Rakes, a man with whom Wolfe had served time, that after the shooting Wolfe had a Desert Eagle in his possession, to which Wolfe responded that he did not make that statement, never owned a Desert Eagle, never said he or McQuirt had a gun, and his possession of a gun would have been a violation of his probation. Shewmaker later called Rakes as a witness, who testified that Wolfe had told him that "he had a forty-four magnum Desert Eagle," that he had never met Shewmaker, and Shewmaker never asked him to testify falsely. Id. at 724. On cross-examination, Detective Rayborn testified that he interviewed Walker two times and that the interviews were recorded on video. A copy of the video recording was admitted and played for the jury. During the interview, Walker told Detective Rayborn that he had seen McQuirt with the Desert Eagle. Detective Rayborn asked if he had "seen her there with it," and Walker replied "[s]he had not that night." Id. at 553. Walker further stated "I mean, I knew she messed with firearms. She was a stripper. She messed with people that wasn't good." Id. at 554. Detective Rayborn asked Walker when and where he saw McQuirt with the Desert Eagle, and Walker answered "[t]his was a couple of weeks ago and this was at Wendy's" and that "[s]he had it in her trunk." Id. Matthews testified that she did not see McQuirt with a gun and did not see anybody approach McQuirt, take a gun, or do anything with a gun.

The State presented evidence that McQuirt died as the result of two gunshot wounds. Dr. Jeffrey Springer, a medical examiner or forensic pathologist, testified that

the first gunshot wound entered McQuirt's chin and exited on the posterior side of her neck, there was stippling around the gunshot entrance, and the gun was fired from a range of approximately one to four feet from McQuirt's face. Dr. Springer testified that the second gunshot wound entered McQuirt on the right middle aspect of her back, passed through her right lung, and exited in the upper aspect of her right thorax, that there was no stippling on McQuirt's back and he could not provide an estimate of the range from which the gun was fired with respect to that wound. He also testified that McQuirt lost about three liters of blood, more than half of her blood, as a result of that gunshot wound.

Shewmaker testified that McQuirt approached his vehicle "[w]alking very briskly" and "hollering and screaming." Id. at 675. He testified that McQuirt "pulled out a gun and pointed it at [him]." Id. at 676. He also testified that McQuirt had the gun "tucked underneath her arm and under her jacket" and "pulled it out." Id. Shewmaker testified that he then "reached and grabbed [his gun] and shot her," that McQuirt "kind of stumbled and went around the back of the truck again," and that when she came "back around to the passenger side of the truck" he shot at her again. Id. at 676-677. He further testified that, following the shooting, he attempted to kill himself and "took a bunch of pain pills" and that "they saved [his] life at University Hospital." Id. at 680.

On cross-examination, Shewmaker testified that McQuirt had pointed a gun at him and that the gun was a "Desert Eagle" which he had reported stolen in January. Id. at 682. He indicated the Desert Eagle was a big gun, a "forty-four magnum," and that it was "[t]he one [he] reported stolen." Id. at 686. The prosecutor questioned Shewmaker regarding his statements to House and Officer Gilley and then stated in part, "[y]ou didn't

7

say nothing about shooting her in self-defense and on November the 4th of 2013 nine months later, you come in here and start talking about self-defense." Id. at 688. Shewmaker's counsel objected and moved for a mistrial on grounds that the prosecutor improperly commented on Shewmaker's right to remain silent. After hearing arguments, the court denied the motion and instructed the jury to disregard the statement. Shewmaker testified that McQuirt still had the Desert Eagle in her hand when she went back inside the apartment. He indicated that he shot McQuirt in the back when she was running away from him but that she still had the gun in her hand. The jury found Shewmaker guilty of murder.

Following a sentencing hearing, the court entered a sentencing order which provided in part:

> The Court finds mitigating factor of no record or history of delinquent or criminal activity and gives that substantial weight. The Court gives weight to the fact that defendant had knowledge that there was at least one child under the age of eighteen in the building as defendant fired the gun and the Court is treating that as an aggravating factor. The Court also considers Indiana Code § 35-38-1-7.1(c) which reads: "The criteria listed in subsections [(a) and (b)] do not limit the matters that the court may consider in determining the sentence." Court considers these facts and circumstances: (a) shooting a woman in the back as she is running away, (b) when she was still alive, (c) after defendant shot the victim one time, (d) all of defendant's acts took place within the hearing distance of a person under the age of eighteen (18), (e) certainly within the range of where other adults with a child in the home (victim's house to where she was running), (f) repeated firing of the gun was a random, reckless sequence of acts, and (g) that was devoid of any consideration of the value of human life or other persons.
>
> The Court sentences the defendant to the Indiana Department of Correction and finds the aggravating, and other, factors outweigh any mitigating evidence the Court heard. Advisory sentence is 45 years of imprisonment (imposed) and the Court increases the sentence to a term of 65 years, based on the above.

Appellant's Appendix at 129.

DISCUSSION

I.

The first issue is whether the court abused its discretion in denying Shewmaker's motion for mistrial. "The granting of a mistrial lies within the sound discretion of the trial court, and we reverse only when an abuse of discretion is clearly shown." Davis v. State, 770 N.E.2d 319, 325 (Ind. 2002), reh'g denied. "The remedy of mistrial is 'extreme,' Warren v. State, 757 N.E.2d 995, 998-999 (Ind. 2001), strong medicine that should be prescribed only when 'no other action can be expected to remedy the situation' at the trial level, Gambill v. State, 436 N.E.2d 301, 304 (Ind. 1982)." Lucio v. State, 907 N.E.2d 1008, 1010-1011 (Ind. 2009). We afford the trial court such deference on appeal because the trial court is in the best position to evaluate the relevant circumstances of an event and its impact on the jury. Alvies v. State, 795 N.E.2d 493, 506 (Ind. Ct. App. 2003), trans. denied. To prevail on appeal from the denial of a motion for a mistrial, the appellant must demonstrate the statement or conduct in question was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. Id. We determine the gravity of the peril based upon the probable persuasive effect of the misconduct on the jury's decision rather than upon the degree of impropriety of the conduct. Id.

We begin by discussing the portion of the record cited by the parties related to Shewmaker's motion for a mistrial. During his testimony, House testified that, early in the morning of February 18, 2013, Shewmaker called him and stated "that he had made a

mistake" and that "there was nothing he could do about" it, but that he was going to go home and see his mom and dad. Transcript at 73-74. When asked if Shewmaker said anything about "a self-defense situation," House replied "[h]e never said anything other than that essentially." Id. at 75. In addition, Officer Gilley testified that he spoke with Shewmaker at the time he took him into custody, that Shewmaker asked him "is she dead," and that Officer Gilley answered that he did not know. Id. at 268. Officer Gilley did not testify that Shewmaker made any comments regarding self-defense. The parties agree that, after Shewmaker was advised of his Miranda rights at the police station, he invoked his right to remain silent. In addition, the record shows that the trial court granted a motion *in limine* filed by Shewmaker's counsel prior to trial to exclude any evidence pertaining to the advisement of Shewmaker of his Miranda rights and Shewmaker's silence or refusal to answer questions following the Miranda advisements.

During the defense's presentation of evidence at trial, Shewmaker testified that he had acted in self-defense when he shot McQuirt. On cross-examination, after questioning Shewmaker about the shooting, the following exchange occurred between the prosecutor and Shewmaker:

Q. Okay. All right. You called your best friend [House] . . . .

A. Yes, sir.

Q. . . . when you drove off after you shot her, your best friend. And you didn't say she had a forty-four magnum pointed in my face. I had to kill her. You said, I made a mistake. Nothing I can do about it. Now that's what you told him, isn't it?

A. Yes, sir.

Q. You told Ron House?

10

A. Yes, sir.

Q. And when you talked to Officer Gilley, the deputy that you wanted or your family wanted to come and arrest you, you said some things to him, didn't you? You said, is she dead? Isn't that what you asked him?

A. That's what he said I asked, yes.

Q. All right. Well you didn't tell Officer Gilley she put a gun in my face, did you?

A. I didn't tell nobody nothing, other than my father.

Q. All right. So after this happened, you talked to Officer Gilley, you talked to your best friend. You didn't say nothing about shooting her in self-defense and on November the 4th of 2013 nine months later, you come in here and start talking about self-defense, correct?

Id. at 687-688. Shewmaker's counsel then objected and moved for a mistrial.

Shewmaker's counsel stated that the prosecutor "now commented on his right to remain silent," that it was "perfectly okay for him to talk about what he said to Mr. House because he told us he talked to Mr. House," but "he invoked his right to remain silent and now [the prosecutor] has told the jury that he didn't say anything for nine months until today and it's a direct comment on his right to remain silent." Id. at 688-689. The court later stated "[y]ou're only referring to it in terms of that man, the layperson, and so far it's only been the layperson and one policeman, right," and Shewmaker's counsel replied "And that was fine. And we didn't object. But then he said, and for nine months you didn't say anything about this and you came to Court and now you're saying it's self-defense." Id. at 691. Shewmaker's counsel argued that "what [the prosecutor] has effectively done is he's commented on [Shewmaker's] right to remain silent every single

11

day" since he invoked his right to remain silent and "now we're in the position, when he stands up and argues his case, we've got to try to overcome the fact of why wouldn't you talk about this for nine months that it's self-defense." Id. at 694. Shewmaker's counsel argued that Shewmaker's constitutional rights were violated and that there was "no way at this point we can get a fair trial." Id. at 695.

In response, the prosecutor argued that Shewmaker willingly spoke with House and Officer Gilley, that he "[n]ever mentioned it was self-defense and now nine months later you come in here and say I shot her in self-defense," that "[t]hat is perfectly permissible argument," and that "[i]t's a comment on the evidence." Id. The prosecutor argued that he was careful not to mention to the jury that Shewmaker spoke with Detective Rayborn, that "this jury has no idea he even spoke to Detective Rayborn, so this is all fair questioning based on the evidence that's going on," and that "[n]ever once have a [sic] mentioned his right to silence or the fact that he wouldn't talk to the police" and "I simply said that he talked with two people and that he was close with early on and never mentioned it and now [at] the trial he's talking about it." Id. at 696. Shewmaker's counsel argued that "when you start saying nine months later after he's been arrested and you don't say anything until today, now you've commented on nine months of silence . . . ." Id. at 697-698. Shewmaker's counsel asked for an admonition to disregard the prosecutor's last question if the court overruled the motion for a mistrial.

The court stated that it was finding that Shewmaker had not been "placed in grave peril that can't be cured" but would give an admonition. Id. at 700. After discussing the

12

language of the admonition with counsel and obtaining their approval, the court gave the following admonition to the jury:

> Ladies and gentlemen of the jury, I want to give you an instruction with regard to the last few minutes of questions and answers and testimony and I'm instructing you to disregard any testimony that has occurred after the date, relative to the dates after February 18, 2013. During that time, it was legally impermissible for Mr. Shewmaker to answer any questions about his defenses or what he might say in a trial. So you are to disregard those last exchanges about did he say any comment about self-defense after February 18, 2013.

Id. at 703-704.

On appeal, Shewmaker asserts the court abused its discretion in denying his motion for mistrial and requests a new trial. He argues that the prosecutor's comment that he did not mention self-defense for nine months after the day of the offense until trial was an unambiguous comment on his post-Miranda silence. He argues the prosecutor's comment placed him in grave peril and was not harmless, in part because the State initiated the line of questioning, his defense called the State's evidence of guilt into serious question, the intensity of the State's remark supports reversal, and the admonition was insufficient to cure the error. With respect to the evidence, Shewmaker argues that most of the witnesses who testified they did not see McQuirt with a gun before or after she was shot had serious credibility problems or reasons to lie about the presence of a gun, and that he presented compelling evidence that McQuirt possessed a gun on the night in question. With respect to the court's admonition, Shewmaker argued that no admonition could cure the State's egregious violation of the rule articulated in Doyle v. Ohio, 426 U.S. 610, 96 S. Ct. 2240 (1976), and that the State's use of his post-Miranda silence went to the heart of the case.

13

The State maintains that the court properly denied the motion for mistrial, and that the prosecutor limited his impeachment of Shewmaker's silence to his pre-<u>Miranda</u> silence by questioning him only as to his failure to make a self-defense claim to House and Officer Gilley. The State further argues that, even if the prosecutor's questions violated Shewmaker's post-<u>Miranda</u> silence, the resulting error was harmless. Specifically, the State argues the reference challenged by Shewmaker was "made only during a single line of questioning," that in final argument the State referred only to Shewmaker not mentioning his self-defense claim to House and Officer Gilley, and that the trial court provided a curative instruction to the jury. Appellee's Brief at 10. The State also argues that the evidence of Shewmaker's guilt was overwhelming and that he admitted he shot McQuirt in the face from a range of one to four feet and then in the back. The State notes that other witnesses testified McQuirt did not have a handgun on her person when she walked out to talk to Shewmaker, that the police did not find a gun at the crime scene, and that Shewmaker filed multiple shots at McQuirt, one of which struck her in the back as she was fleeing from him. In his reply brief, Shewmaker asserts that, in reviewing whether an error was harmless, this court does not view the evidence in the State's favor but reviews all of the evidence.

"In <u>Doyle</u>, the United States Supreme Court held that under the Fourteenth Amendment a prosecutor may not use the silence of a defendant who has been arrested and Mirandized to impeach the defendant." <u>Trice v. State</u>, 766 N.E.2d 1180, 1182 (Ind. 2002) (citing <u>Doyle</u>, 426 U.S. at 619, 96 S. Ct. at 2245). "<u>Miranda</u> warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will

14

not be used against him." Id. at 1183 (citation omitted). "A defendant's post-arrest, post-Miranda silence may not be used to impeach a defendant, . . . but a defendant's post-arrest, pre-Miranda silence may be used for impeachment purposes." Peters v. State, 959 N.E.2d 347, 353 (Ind. Ct. App. 2011) (citing Doyle, 426 U.S. at 617, 96 S. Ct. 2240; Fletcher v. Weir, 455 U.S. 603, 607, 102 S. Ct. 1309 (1982)); see also Barton v. State, 936 N.E.2d 842, 851 (Ind. Ct. App. 2010) (noting that "evidence of a defendant's post-Miranda silence is generally not admissible and that a prosecutor's comment on a defendant's pre-arrest, pre-Miranda silence is not prohibited), trans. denied.

Shewmaker challenged the following sentence by the prosecutor: "You didn't say nothing about shooting her in self-defense *and on November the 4th of 2013 nine months later, you come in here and start talking about self-defense.*"[5] Transcript at 688 (emphasis added). "A defendant who receives Miranda warnings is advised that he may remain silent; he is not warned that the right continues only while he is in the custody of the arresting officers." Sobolewski v. State, 889 N.E.2d 849, 857 (Ind. Ct. App. 2008) (quoting Jones v. State, 265 Ind. 447, 451, 355 N.E.2d 402, 405 (1976)), trans. denied. "Penalizing the accused for silence before trial is no less punishment for the exercise of a right than penalizing silence at the time of arrest." Id. We conclude that, by asking about or commenting on the fact Shewmaker had not said anything about shooting McQuirt in self-defense for nine months, the prosecutor was clearly attempting to impeach Shewmaker's credibility with his post-arrest silence, which is impermissible under Doyle. See id. (concluding that, "by asking Sobolewski why he had not informed police about

_____

[5] Shewmaker's counsel did not challenge the prosecutor's questions and Shewmaker's responses related to the statements he had made to House and Officer Gilley, which occurred before he was given his Miranda rights.

his tattoo while awaiting trial, the prosecutor was clearly attempting to impeach Sobolewski's credibility with his post-arrest silence, which is impermissible under Doyle").

However, the use of a defendant's post-arrest silence to impeach a defendant's exculpatory explanation is subject to harmless error analysis. Id. (citing Robinette v. State, 741 N.E.2d 1162, 1164 (Ind. 2001) (citing Chapman v. California, 386 U.S. 18, 23, 87 S. Ct. 824, 827 (1967))). A constitutional error may be harmless if it is clear beyond a reasonable doubt that the error did not contribute to the defendant's conviction. Id. (citing Kubsch v. State, 784 N.E.2d 905, 923 (Ind. 2003) (citing Chapman, 386 U.S. at 24, 87 S. Ct. at 828)). In analyzing whether a Doyle violation is harmless beyond a reasonable doubt, we examine five factors: (1) the use to which the prosecution puts the post-arrest silence; (2) who elected to pursue the line of questioning; (3) the quantum of other evidence indicative of guilt; (4) the intensity and frequency of the reference; and (5) the availability to the trial court of an opportunity to grant a motion for mistrial or give a curative instruction. Id. (citing Robinette, 741 N.E.2d at 1165).

After reviewing the record in light of the above factors, we conclude that the error here was harmless. As to the first two factors, the prosecutor used cross-examination in an attempt to impeach Shewmaker's post-Miranda silence, and the prosecutor elected to pursue the line of questioning. Regarding the quantum of other evidence indicative of guilt, the record shows the jury heard extensive testimony regarding Shewmaker's claim of self-defense and the testimony of Walker, Wolfe, and McGhee, each of whom testified McQuirt did not have a gun at the time of the shooting. Shewmaker's counsel questioned

16

the State's witnesses regarding their observations of Shewmaker and McQuirt and other facts which related to their credibility, including their prior convictions and pending charges. Shewmaker presented evidence that he had reported to police on January 29, 2013 that his Desert Eagle had been stolen from his vehicle, elicited testimony from Wolfe and Walker regarding whether they had made previous statements about observing McQuirt with a Desert Eagle, and presented the testimony of Rakes regarding Wolfe's statement to him and a video recording of Walker's previous statement to Detective Rayborn. The jury heard testimony regarding Shewmaker's actions of stabbing the tires of McQuirt's vehicle, as observed by a neighbor, and his confrontation with those in Wolfe's apartment when looking for McQuirt. The State presented evidence regarding the shooting including the location of Shewmaker and his truck relative to the apartment at the time, the locations of the impact of the bullets fired by Shewmaker's gun, and the fact McQuirt was shot in the face from a distance of one to four feet and then in the back as she was running away. When the court read its final jury instructions to the jury, it instructed the jury regarding self-defense, including when a person may use reasonable force to protect himself, when the defense is unavailable, and the fact that the State had the burden of proving beyond a reasonable doubt that Shewmaker did not act in self-defense.

With respect to the intensity and frequency of the prosecutor's reference to Shewmaker's post-Miranda silence, we note that Shewmaker's jury trial was conducted over a four-day period and that Shewmaker and a number of other witnesses testified at length regarding the shooting, the events leading up to and following the shooting, and

Shewmaker's self-defense claim. In addition, the record shows as set forth above that the prosecutor's impermissible reference to Shewmaker's post-<u>Miranda</u> silence was one sentence. The comment was made immediately following the prosecutor's cross-examination of Shewmaker regarding his pre-<u>Miranda</u> statements to his friend House and to Officer Gilley and the fact that he did not tell them that McQuirt had pointed a gun at him, and Shewmaker does not challenge those questions as impermissible. The prosecutor did not reference or emphasize Shewmaker's post-<u>Miranda</u> silence during closing arguments.

Finally, the trial court gave a curative instruction regarding the prosecutor's reference to Shewmaker's silence. When he requested an admonition, Shewmaker's counsel asked the court "to say the Prosecutor's last question was improper . . . but I don't want to read the question back and have the bell rung again," and the court indicated it understood. Transcript at 699. The court discussed proposed language for the instruction and suggested language that the jury was "to disregard the line of questioning . . . beyond his talks with Mr. House and Officer Gilley during those times he had asserted his constitutional right to remain silent." <u>Id.</u> at 702. Shewmaker's counsel stated that "that makes it worse" and suggested language that "it was legally impermissible for [] Shewmaker to comment on his case," and the court accepted the language. <u>Id.</u> at 702-703. The trial court instructed the jury to disregard any questions and answers related to what may have occurred after February 18, 2013, that "it was legally impermissible for Shewmaker to answer any questions about his defenses or what

18

he might say in a trial," and that the jury was to disregard the "exchanges about did he say any comment about self-defense after February 18, 2013." Transcript at 703-704.

Based upon the record, we conclude that the Doyle violation, in light of the factors discussed above, was harmless beyond a reasonable doubt and that Shewmaker has not established that the prosecutor's question or statement was so prejudicial and inflammatory that Shewmaker was placed in a position of grave peril to which he should not have been subjected or that the jury's decision was affected by the statement. See Peters, 959 N.E.2d at 353-355 (holding that the challenged testimony of the defendant's silence was harmless in part because the evidence of the defendant's guilt was strong, the references were brief, and the prosecution did not emphasize the defendant's silence in closing arguments); Barton, 936 N.E.2d at 851-852 (holding there was no Doyle violation in part because the State's comments were not necessarily directed solely at the prohibited post-Miranda time frame, that the State's closing argument illustrated the defendant's trial testimony was inconsistent with his comments to the police, and that when read in context and considering the record in its entirety the comments did not rise to the level of Doyle violations), trans. denied; Sobolewski, 889 N.E.2d at 857 (concluding after reviewing the record in light of the factors that the error of the prosecutor attempting to impeach the defendant's credibility with his post-arrest silence was harmless). The trial court did not abuse its discretion in denying Shewmaker's motion for mistrial.

II.

The next issue is whether the court abused its discretion in sentencing Shewmaker. We review the sentence for an abuse of discretion. Anglemyer v. State, 868 N.E.2d 482, 490-491 (Ind. 2007), clarified on reh'g, 875 N.E.2d 218 (Ind. 2007). A trial court abuses its discretion if it: (1) fails "to enter a sentencing statement at all;" (2) enters "a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons;" (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration;" or (4) considers reasons that "are improper as a matter of law." Id. at 490-491. However, the relative weight or value assignable to reasons properly found, or those which should have been found, is not subject to review for abuse of discretion. Id. at 491.

Shewmaker asserts there is no evidence he knew a child was in the residence or that the crime occurred within hearing or range of a child. He further argues that the fact he shot McQuirt while she was still alive, that he shot her twice, that he shot recklessly, and that he demonstrated a lack of consideration for human life are all inherent in the crime of murder. He also claims the court failed to find as a mitigating factor the fact that McQuirt provoked him. He argues that "the provocation helps explain the murder and should mitigate the offense," that "[McQuirt] pretended to love" him, that she "went so far as to pretend to be engaged to [him] even though she was already married and dating a third man," that he "gave her ten to twenty thousand dollars, put a down payment on an apartment and car, and spent time with her children," that she "enlisted her children

20

in the ruse," and that she "concocted this elaborate ruse to con [him] out of money and gifts." Appellant's Brief at 27-29.

The State argues Shewmaker did not advance the mitigating factor that McQuirt provoked him at sentencing and thus that he is precluded from advancing it on appeal. The State maintains there was ample evidence that two children were inside the residence where McQuirt was staying at the time of the shooting, but also acknowledges that the court's finding that Shewmaker had knowledge of a person under eighteen being inside the house was probably improper. The State argues that the aggravating factors that Shewmaker shot recklessly and that he demonstrated a lack of consideration for human life do not apply to McQuirt's murder but to the surrounding circumstances that endangered everyone else in the house and neighborhood where the shooting occurred, and points to evidence that bullets were shot at a child's bedroom, hit an outside light, hit a vehicle, and lodged in a door to the residence. The State also argues that shooting a fleeing woman in the back is not an inherent element of the crime of murder but demonstrates the nature and circumstances of the crime which is a valid aggravating factor.

In his reply brief, Shewmaker contends that he sufficiently requested the court identify the fact that McQuirt provoked him as a mitigator and that, regardless, this court should consider this factor as part of its Appellate Rule 7(B) review. He also argues that, while aggravating factors may include a material element of the crime, the court should not consider circumstances inherent in the crime and that it would be irrational to

21

aggravate a crime based upon factors that do not indicate the crime was committed in a manner more serious than the basic, underlying offense.

While the State acknowledges the court should not have found that Shewmaker had knowledge that there was at least one child under the age of eighteen in the apartment at the time of the shooting, the record supports the court's other aggravators. Specifically, the record reveals that McQuirt's daughter who was fifteen years old at the time of trial, and Matthews's daughter who was three years old at the time of the offense were inside the apartment at the time of the shooting, and a number of persons in the apartment heard the gunshots, which supports the court's findings that the shooting took place within the range and hearing distance of a person under the age of eighteen. Shewmaker fired shots which resulted in bullets or bullet fragments striking the door and window of the apartment and a vehicle, which supports the court's findings that firing his weapon was reckless and devoid of consideration of the value of human life. Shewmaker's actions endangered several other individuals in the residential area of the shooting, and this was not an element of the offense with which he was charged or an improper consideration in sentencing. In addition, the court's observations that Shewmaker shot McQuirt in the back as she was running away and after he had shot her one time are findings regarding the nature and circumstances of the crime which is a valid aggravating factor. See Anglemyer, 868 N.E.2d at 492 (noting "the nature and circumstances of the crime as well as the manner in which the crime is committed, has long been held a valid aggravating factor").

The determination of mitigating circumstances is within the discretion of the trial court. Rogers v. State, 878 N.E.2d 269 (Ind. Ct. App. 2007), trans. denied. The trial court is not obligated to accept the defendant's argument as to what constitutes a mitigating factor, and a trial court is not required to give the same weight to proffered mitigating factors as does a defendant. Id. A trial court's determination of a defendant's remorse is similar to a determination of credibility. Pickens v. State, 767 N.E.2d 530, 534-535 (Ind. 2002). Without evidence of some impermissible consideration by the court, we accept its determination of credibility. Id. The trial court is in the best position to judge the sincerity of a defendant's remorseful statements. Stout v. State, 834 N.E.2d 707, 711 (Ind. Ct. App. 2005), trans. denied. Shewmaker points to his defense counsel's argument that his "character and attitudes indicates [sic] that he is a person that's unlikely to commit another crime, I think that's true and I think these were exceptional circumstances" and that "there were a great many other facts and circumstances submitted in evidence in this Court that I think this Court can take into consideration to determine whether or not it's mitigating offense." Appellant's Reply Brief at 8 (citing Transcript at 887). We do not believe the statements of Shewmaker's counsel at sentencing amounted to an argument that the trial court should consider provocation as a mitigating circumstance. Anglemyer, 868 N.E.2d at 492 (noting the trial court does not abuse its discretion in failing to consider a mitigating factor that was not raised at sentencing). To the extent Shewmaker argues the court nevertheless should have found provocation to be a mitigator, we note the court was able to consider the evidence presented throughout the multi-day jury trial, including the nature of McQuirt's actions of

receiving money from Shewmaker over a period of time and the level of deception McQuirt used, as well as Shewmaker's decisions on the night of the murder to drive around Clarksville looking for McQuirt, to demand that she talk to him, to slash the tires of her car, and to shoot her and drive away. The jury rejected Shewmaker's self-defense claim. The trial court was not required to believe that mitigating weight should be given to Shewmaker's crime as a crime caused by provocation. See Ousley v. State, 807 N.E.2d 758, 763 (Ind. Ct. App. 2004) (holding that, while the defendant's wife may have fallen in love with another man and hit the defendant as they fought about him reading her diary, her actions were not so significant that the trial court was required to believe the defendant's crime of killing her was due mitigating weight as a crime caused by provocation).

We also note the relative weight or value assignable to reasons properly found is not subject to review for abuse of discretion, and we can say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record. Anglemyer, 868 N.E.2d at 491. The trial court did not abuse its discretion in sentencing Shewmaker.

III.

The next issue is whether Shewmaker's sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B) provides that this court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the

defendant to persuade the appellate court that his or her sentence is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

Shewmaker argues his character demonstrates his sentence is inappropriate and points to evidence of the support of his family and friends, that he was described as a kind, non-violent person, that he assisted his elderly neighbor with getting in and out of his tractor and repaired the tractor at no charge, that he had a strong work history for his family's farm equipment business, and that he worked six to seven days a week. He argues he is far from the worst of offenders. He further maintains the nature of the offense does not warrant the maximum sentence, that he committed the offense after realizing that McQuirt was pretending to love him in order to perpetrate an elaborate scam, and that he did not commit the offense with any brutality not already inherent in the crime of murder.

The State argues that the nature of the offense is egregious in that Shewmaker, armed only with a rumor from another stripper that McQuirt had misused him, made a concerted effort to find and kill McQuirt, shooting her in the face at close range and then in the back as she fled from him. The State also argues that Shewmaker's reckless shooting endangered numerous others. The State also asserts that, although Shewmaker has no criminal history, he nevertheless used marijuana and frequented strip clubs, that his character is not entirely without issues, and that he has anger problems which led him to slash McQuirt's car tires. In his reply brief, Shewmaker contends that the murder was not committed in an egregious manner, that he has absolutely no criminal history, and that he acted under strong provocation.

25

Our review of the character of the offender reveals that Shewmaker had no criminal history prior to this offense and that he was employed and had a good reputation among his family and neighbors as a hard worker and good son. Our review of the nature of the offense reveals that, after Shewmaker heard that McQuirt had been using him for money, he attempted to find her at her mother's house and then drove around Clarksville attempting to locate her. He ultimately found McQuirt's car near Wolfe's apartment, which he remembered because he had dropped McQuirt off nearby once before, demanded to see McQuirt, slashed her tires so that she could not drive away, and then, when she exited the apartment, shot her in the chin and again in the back while she was running away from him. He fired his gun four times, and in addition to the bullets which struck McQuirt, a bullet or bullet fragments impacted the window of a child's bedroom of the apartment and a vehicle. While Shewmaker may have been angry due to McQuirt's actions of taking advantage of him, the jury did not find that he acted in self-defense when he shot her, and we are not persuaded based on the evidence presented at trial and sentencing that Shewmaker's sentence should be reduced on the basis of McQuirt's actions.

After due consideration, we conclude that Shewmaker has not sustained his burden of establishing that his sentence of sixty-five years is inappropriate in light of the nature of the offense and his character. See McClendon v. State, 910 N.E.2d 826, 837 (Ind. Ct. App. 2009) (affirming the defendant's maximum sentence of sixty-five years for murder where the defendant had no criminal record, the defendant drove by the residence of the

victim several times, and a six-year old child was in the house at the time of the shooting), trans. denied.

CONCLUSION

For the foregoing reasons, we affirm Shewmaker's conviction and sentence for murder.

Affirmed.

BARNES, J., and BRADFORD, J., concur.